## MUNICIPAL APPROPRIATIONS FOR CELEBRATION OF PATRIOTIC EVENTS.

Common Pleas Court of Cuyahoga County.

THE CITY OF CLEVELAND, BY JOHN N. STOCKWELL, DIRECTOR OF LAW, v. THOMAS COUGHLIN, DIRECTOR OF FINANCE, ET AL.

Decided, October 10, 1914.

*Municipal Corporations—Legality of Action Taken Depends Upon Power to Do and the Method Employed in Carrying it Out—Appropriation for Celebration of Perry's Victory—Power to Make Under the Cleveland Charter—Presumption as to Regularity of Proceedings of Council—Contracts—Ratification.*

The appropriation made by the council of the city of Cleveland toward the expense of celebrating the centennial anniversary of Perry's Victory on Lake Erie, was an appropriation for a public purpose and was authorized by the charter of that city.

*J. N. Stockwell* and *A. E. Powell,* for plaintiff.
*Newton D. Baken* and *Jos. C. Hostetler,* contra.

KENNEDY, J.

This is an action brought by the city solicitor of the city of Cleveland on behalf of the city to restrain the defendants, officers of the city of Cleveland, from carrying out the provisions of ordinance No. 32,012, passed by the council of the city and authorizing and directing the commissioner of accounts "to draw his warrant upon the treasury of the city of Cleveland in the sum of $6,000 payable to the treasurer of the finance committee of the Perry's Victory Centennial Commission of Cleveland." The ordinance provided further that the said sum shall be paid only when the commissioner of accounts "is satisfied by sufficient evidence that the Perry's Victory Centennial Commission will discharge all claims against it in full by the disbursement of the said sum of $6,000."

The facts are fully set forth in the petition and answer, and argument was had and the case submitted upon these pleadings, that is to say, upon plaintiff's motion for judgment upon the pleadings.

Briefly and in substance the facts are these: In October, 1911, the council of the city of Cleveland passed a resolution setting forth that the Perry's Victory Centennial Commission appointed by the Federal Government, and by the states of Ohio, Pennsylvania, Michigan, Illinois, Wisconsin, New York, Rhode Island and Kentucky, had adopted measures looking to a fit observance of the centenary of Perry's victory on Lake Erie and the other events of the War of 1812; and that it was the desire of this main committee that the patriotic celebration of these events should extend to all of the principal ports on the Great Lakes. This resolution authorized the mayor to appoint a committee of seven citizens "to direct the participation of this municipality in conjunction with her sister cities on the Great Lakes" in this celebration. In pursuance to this resolution, a committee of seven was appointed by the mayor of the city of Cleveland. Thereafter the original committee of seven was enlarged by the mayor, and this committee collected from the citizens of Cleveland a sum in excess of $7,000 for the purpose of conducting this celebration. Early in the year 1913 certain of

the members of this commission resigned and on the 28th day of March of that year the mayor, in a communication to the council, notified that body that unless otherwise directed by them, he would arrange for the celebration of Perry's victory by appropriate exercises in the public parks of the city, and that such celebration would be conducted by the city park department. Nothing further was done by the council until June 30, 1913, when a resolution was passed *"requesting"* the mayor "to take immediate steps to secure the presence of the Niagara in Cleveland harbor on its memorial trip, and make every effort to arrange a celebration of this occasion which will truly represent the loyal and patriotic spirit of the people of Cleveland." This is the language of the resolution. After the passage of this resolution of the council of the city of Cleveland, the mayor appointed a committee of one hundred representative citizens of Cleveland to have charge of the various arrangements in connection with this celebration. This committee collected a sum, alleged in the answer to have been in excess of $38,000, by private subscription, and the celebration was held. There was a deficit of approximately $9,000 when the celebration was completed. Of this amount, as I was informed by counsel at the trial, the state of Ohio, through its military department, paid about $3,000, and the city council, in its appropriation ordinance for the year 1914, set aside the sum of $6,000 to wipe out the remainder of the deficit. On the 19th day of January the council, by resolution, called upon the Perry Centennial Commission appointed by the mayor to furnish to the council "a detailed statement to show receipts of all sums from whatever source, and expenditure of the same." This statement was prepared and filed with the council, and thereafter, on the 8th day of June, 1914, the council passed the ordinance, to enjoin the operation of which this action is brought by the plaintiff.

In every case similar to this involving the validity of any action of a municipal corporation, the two main questions involved are these: first, has the municipality in question the power to do the particular act? Second, if there is sufficient power, has there been an exercise of it according to law? In every such

case it is quite essential to bear in mind the distinction between the *thing* which the municipality is attempting to do, and the *method* which has been selected to do it. Whether or not a municipality has or has not the legal right to do a particular thing depends upon its *powers,* but when once it .is determined that power sufficient to do the act is possessed by the municipality, then the question of method depends upon the restrictions, if any, which have been placed upon the exercise of the power by the authority from which the power comes. To illustrate: Municipalities in Ohio are by general law given the power "to contract." Now, if the Legislature had seen fit to place no restrictions upon this power to contract, then the method of contracting would have been performed by each municipality as in its opinion was best fitted to its needs. After determining that the municipal corporation has the power to contract, it must be shown, in order to invalidate any particular contract, that the method used in entering into it was in disregard of some specific and mandatory restriction placed upon the exercise of the power by the source from which it came. The thing which the municipality is attempting to do in this case is to pay for certain material and labor, furnished upon the order of a commission appointed by the mayor, at the request of the city council, and used in the celebration of an event which the city council had decided to be for the best interest of the city to celebrate. The fact that the check of the city is to be made to the treasurer of the commission does not change the use to which it is put, for, an officer of the city, to-wit, the commissioner of accounts, is given full and complete control over the distribution which is to be made of the fund. In my opinion, if the city of Cleveland, on the date of the passage of this ordinance No. 32012, had the power to expend money raised by taxation for this sort of a celebration, it had the power to ratify the expenditure which had already been made, and having ratified such expenditure, it has the power to order that payment be made. The books are full of cases in which the doctrine of ratification has been applied to acts and contracts of municipal corporations. In every case in which the doctrine was applied, it

was for the purpose of validating an act or contract which would otherwise be invalid, because clearly, if a given contract complies with every provision of the law, and is a legal and binding contract, there is no reason nor need for invoking the doctrine of ratification. An act or contract which was *ultra vires* at the time it was performed or entered into may be ratified if there is power in the corporation to authorize the act or to make the contract at the time of ratification.

In 28 Cyc., 675, the law is stated as follows:

"An illegal or *ultra vires* municipal contract being void is not susceptible of validation unless meanwhile the Legislature has conferred upon the corporation power to ratify or to make such contracts, but contracts made by a municipality without authority may be ratified by it when it has acquired authority from the Legislature."

Bearing in mind the distinction between the power to do the thing, and the method by which it shall be done, ratification may cure a defect in method, but not a defect in power. A study of the cases will show that contracts have been held valid upon the theory of ratification where, without it, they would have been invalid because of failure to comply with the restrictions placed by the Legislature upon the making of contracts.

The power of the city of Cleveland to make this sort of expenditure depends upon the construction which shall be given, first, to Section 3 of Article XVIII of the Constitution of the state of Ohio as amended in 1913, and which reads as follows: "Municipalities shall have authority to exercise all powers of local self government  *  *  *," and second, to the charter of the city of Cleveland which was adopted by the people on the first day of July, 1913, and by which the people of the city accepted this power of "local self government" and provided for its exercise. Section 198 of the charter provides:

"For the purpose of nominating and electing officers and *exercising the powers of the city* as provided herein, this charter shall take effect from the time of its approval by the electors of the city."

"The powers of the city" are set forth at length in Sections 1 and 2 of the charter.  Such powers as relate to the matter in issue here are as follows:

Section 1.  "The inhabitants of the city of Cleveland, as its limits now are or may hereafter be, shall be a body politic and corporate, by name, the city of Cleveland, and as such shall have perpetual succession  *  *  *;  may appropriate the money of the city for all lawful purposes;  *  *  *  may pass such ordinances as may be expedient for maintaining and promoting the peace, good government, and welfare of the city, and for the performance of the functions thereof.  The city shall have all powers that now are or hereafter may be granted to municipalities by the Constitution or laws of Ohio; and all such laws, whether express or implied, shall be exercised and enforced in the manner prescribed by this charter, or when not prescribed herein, in such manner as shall be prescribed by ordinance or resolution of the council."

Section 2. . "The enumeration of particular powers by this charter shall not be held or deemed to be exclusive, but, in addition to the powers enumerated herein, implied thereby, or appropriate to the exercise thereof, the city shall have, and may exercise all other powers which, under the Constitution and laws of Ohio, it would be competent for this charter specifically to enumerate."

In the case of *Morton* v. *Philadelphia,* 4 Pennsylvania Dist., 523, the court was considering the power of the city to spend public money to transport the Liberty Bell to the Atlanta Exposition and exhibit it there.  The grant of power in the charter of Philadelphia, upon which the decision turned, provided that the city shall have "full power and authority to make, ordain, and establish such and so many laws, ordinances, and regulations as shall be necessary for the *welfare and comfort* of the city."  The court at page 544 says, in speaking of the scope of this grant of power:  "This is a very extensive and most comprehensive grant of power."  And further along the same page: "Our charters are as broad as the illimitable ocean of our necessities and our welfare."

The specific grant of power in the charter of Cleveland, Section 1, to "pass such ordinances as may be expedient for main-

taining and promoting the peace, good government, and welfare of the city'' would, under the rule in the Liberty Bell case, justify this sort of expenditure. When one reads the last sentence of Sections 1 and 2 of the Cleveland charter, it is plain that the intention of the people of Cleveland when they adopted this charter was to accept the benefits of home rule and provide for the exercise of ''local self government'' to the fullest extent. The methods of the exercise of certain functions of this local sovereignty are fully prescribed by the language of the charter. In addition, Section 2 clearly shows that this charter was not intended to carry only such powers as are specifically mentioned, but was rather to give to the municipality, to use the words of the charter, ''all other powers which under the Constitution and laws of Ohio it would be competent for this charter specifically to enumerate.''

The only remaining question which can affect the power of the city to do this thing is this: Would it be competent for the charter specifically to enumerate the power to contribute toward a celebration of patriotic events? The municipality in the exercise of the right of ''local self government'' is, of course, bound by the provisions of the Constitution of the state of Ohio, the same as is the Legislature of the state in matters of state government. Neither of them can spend money derived from taxation for other than ''public purposes.'' The state Legislature under the old scheme of ''delegated'' powers could not delegate the right to a municipality to spend public money for other than ''public purposes.''

That the expenditure of public moneys for this kind of a celebration *is* a public purpose; that state Legislature *may* make such expenditures upon the part of the state; that the Legislature *may* delegate to municipalities the power to make such expenditures of public funds, are propositions which have been decided over and over again. The leading cases, or practically all of them, are cited in the brief filed by the defendants, and I shall make no effort to review them at this time or make any lengthy quotations. The cases do not hold that the discretion

of the legislative bodies is absolute and not subject to judicial review. The case of *Doggett* v. *Colgan,* 92 Cal., 53, states this rule as follows:

"What is for the public good, and what are public purposes, are questions which the Legislature must decide upon its own judgment, in respect to which it is vested with a large discretion which can not be controlled by the courts, *except perhaps when its action is clearly evasive.*"

There might well be a case where the celebration, for which the municipality was attempting to spend public money, would be so plainly private in its nature that the court would intervene and overrule the will of the legislative body, but the contention has been at no time made that this particular celebration was in any sense private. The fact is that the celebration here was but a part of a nation-wide recognition of the bravery and patriotism shown by Commodore Perry and his men in what is one of the most notable victories ever won upon the water, and we can not be blind to the fact, in considering the question as to whether this was "a public purpose," that six states of the Union and the Federal Government spent together in excess of $600,000 in preparing for and properly celebrating this anniversary.

The case of *State, ex rel City of Toledo,* v. *Lynch,* 88 O. S., 71, is rather unsatisfactory as a precedent, even though it were decisive of the point in issue here. The court in that case laid down two propositions; first, that the amendment to the Constitution granting "home rule" to cities was not self-executing; second, that the city of Toledo could not, by its council, vote to expend public money for the construction and equipment of a moving picture theater. With the first proposition we have no concern. The opinion of Chief Justice Shauck, commencing at page 90, places the second proposition upon two grounds. At page 96 he says:

"Since municipalities get their power from the state, it is mathematically certain that they can include no power not possessed by the state."

The case of *State, ex rel* v. *Guilbert*, 56 O. S., 575, is often referred to upon the proposition that the functions of the state are primarily governmental only, except so far as proprietary rights may become incident to the exercise of the primary function, the conclusion being that the state itself would be without power to construct and operate a motion-picture theater because it is not a "public purpose," nor a "governmental function." At page 97 the chief justice says:

"Among those who had attentively studied the functions of written constitutions, it was accepted as a sound proposition that a municipality might own and operate only such utilities as it used in its municipal operations. Those who are responsible for this amendment were aware that no enlargement of that capacity was denoted by the provisions of the third section 'that municipalities shall have authority to exercise all powers of local self-government,' and, therefore, they employed the express language of the later section of the article to confer that capacity with respect to other utilities. And as to them, there are provisions to safeguard the interests of the people, while capacity to operate amusements, if conferred at all, is conferred without restrictions."

The opinion thus holds that the delegation to municipalities of the powers of "local self government" carried no additional powers to act in a proprietary capacity, in that, inasmuch as a motion picture theater would be operated by the city in its proprietary capacity, the power to do so could not be claimed under this grant. Each municipal action taken under the "home rule" amendment must be in a measure quality itself. This celebration was certainly an exercise of a governmental as distinguished from a proprietary function of the city. It seems to come well within the definition of the phrase of "all powers of local self government" as given by the chief justice at page 97 of the Toledo case:

"They are such powers as, in view of their nature and the field of their operation, are local and municipal in character."

I am of opinion, therefore, as to the *power* of the municipality to do this thing, first, that the celebration of this event was a

public purpose; second, that after the adoption of its charter on July 1, 1913, the city of Cleveland was entirely within its power in expending money to aid and encourage such celebration; third, that having the power to expend money for this purpose when the ordinance in question passed, it made a legal ratification of the expenditure which had been made.

There remain to be considered only one or two objections which were urged as to the propriety of the method adopted by the council in expending this money, to-wit, a commission appointed by the mayor.

It was urged in argument that the provisions of Section 122 of the charter will be violated if this ordinance is made effective. Section 122 is as follows:

"No contract, agreement, or other obligation involving the expenditure of money shall be entered into, nor shall any ordinance, resolution or order for the expenditure of money be passed by the council, or be authorized by any officer of the city, unless the director of finance first certify to the council, or to the proper officer, as the case may be, that the money required for such contract, agreement, obligation, or expenditure, is in the treasury, to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose, which certificate shall be filed and immediately recorded. The sum so certified shall not thereafter be considered unappropriated until the city is discharged from the contract, agreement, or obligation."

Nothing to the contrary appearing in the pleadings, and the allegation of the petition being that ordinance No. 32012 was "duly enacted," it must be presumed that before its passage the director of finance did certify that the sum of $6,000 was in the treasury of the city available for the purpose specified in the ordinance. If this certification was made to the council, then, so far as this case is concerned, Section 122 of the charter has been fully complied with.

There was no contract which bound the city of Cleveland to the payment of a given amount of money prior to the passage of ordinance No. 32012, and therefore there was nothing which

required certification until this ordinance was introduced recognizing the claims and authorizing their payment.

The argument was also made, that even if the city of Cleveland had power to spend public money for celebrating this occasion, the expenditure would have to be made after advertisement and competitive bidding. The charter, in Sections 118 and 119, dealing with the division of purchases and supplies, contains the only restrictions which I can find upon the method to be used in making purchases for the city. The language of these sections, which covers the matter in question here, is as follows:

Sec. 118. ''The commissioner of purchases and supplies shall make all purchases for the city in the manner prescribed by ordinance.  *  *  *''
Sec. 119. ''Before making any purchase or sale, the commissioner of purchases and supplies shall give opportunity for competition, *under such rules and regulations as the council shall establish.*''

If there is any requirement for advertisement and competitive bidding upon purchases in excess of five hundred dollars, as provided by the General Code, since the charter of this city became effective, it must be because of some ordinance of the council prescribing this method. Any requirement which the council has the power to determine upon and prescribe can of course be changed by that body, if in the exercise of its discretion it seems that a change is necessary in any particular event.

It is familiar law, and members of the city law department have argued before me several times and contended, that in the letting of public contracts to the director of public service, for instance, has the power to *waive* any formality which he himself prescribes. The formalities which he has no power to waive are the mandatory enactments of the Legislature restraining the power to contract, at what was, prior to the ''home rule'' charter, its very source. But it seems to me that there are broader grounds which justify this procedure. The city of Cleveland was *not* making a purchase when it approved these expenditures and ordered them paid. It was uniting, through its commission,

with its citizens for the celebration of this event.   Thirty-eight
thousand dollars and over, came from the people of Cleveland
$3,000 from the state of Ohio, over $41,000 in the total from
sources outside of the municipal government.   If the council has
the power to conduct this celebration, they have, in my opinion,
the power to do so in the manner which is apparently the most
successful, namely, by the appointment of a committee through
which the co-operation of the public can be successfully secured.
The state of Ohio expended its $130,000 through a commission,
as did every other state participating in the celebration.   In
every case cited this has been the method used to conduct simi-
lar activities, both by states and municipalities, and in every
case, once it has been decided that the municipality has the
*power* to expend the money for a celebration, no question has
been raised as to the propriety or legality of the city turning its
contribution over to a commission to be used with other money
contributed by individuals, or ordering the proper officers to
pay out money upon the warrant of a commission.   If a con-
tribution may be made before the celebration, how much more
proper it is to provide for the payment of certain items, a de-
tailed account of which is before the council, when the payment
is ordered.

The fact that an act or contract, which it was within the
power of the muncipality to perform or make, may be ratified
in spite of an informality or unusual method in doing the act or
making the contract, and a valid obligation created against the
municipality has been set forth earlier in this opinion.

If this charter set forth specifically the steps to be taken be-
fore any liability was imposed, it could not be more mandatory
and specific than the sections of the General Code which gov-
erned prior to the charter.   In construing the sections of the
General Code, it has been held that where the municipality has
received the benefit, even though, because of some informality,
there could be no payment enforced, the city may recognize the
obligation and authorize the payment.

Mr. Powell, who appeared in argument in this case, in his
letter to Mr. Gordon of March 26, 1914, a copy of which he sub-

mitted as a brief in this case, recognizes and sets forth the authority for this principle in this language:

"I am further of the opinion that if the council had the power in the first instance to appropriate moneys for such purposes, the present situation demands that such legislation be now had, and the executive sustained in his pledge of the city's support. If the power originally reposed in the council to provide in whole or part for the Perry Celebration, an ordinance to that end, though retroactive, would be *proper* if, and if only, the claim comes within the requirements that it is just and is for something beneficial and necessary to the city, but unenforceable by reason of lack of some legal prerequisite. *State* v. *Wall,* 2 N.P.(N.S.), 517."

The ordinance requesting the mayor to appoint the commission which made these expenditures was passed on the 30th of June, 1913. On the first of July, 1913, the charter was adopted. It gave the city full power, if I have construed it correctly. The council has determined that the claims are just, and several times has determined that the celebration was beneficial to the city.

For the reasons given, the motion for judgment on the pleadings is overruled, the temporary restraining order allowed pending the hearing will be dissolved, the injunction will be refused and the petition dismissed.