BILL LOCKYER Attorney General DANIEL G. STONE Deputy Attorney General
THE HONORABLE BONNIE GARCIA, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:
May a city prohibit a chamber of commerce from advertising its support of a ballot measure or a candidate for public office on a sign in front of the chamber's office if the office is located on land leased from the city and the city contracts with the chamber to act as the city's visitors bureau but the lease and the contract are silent with respect to political advertising on the sign?
 CONCLUSION
A city may not prohibit a chamber of commerce from advertising its support of a ballot measure or a candidate for public office on a sign in front of the chamber's office where the sign is located on land leased from the city and the city contracts with the chamber to act as the city's visitors bureau but the lease and the contract are silent with respect to political advertising on the sign.
 ANALYSIS
We are informed that a chamber of commerce has a contract with a city to act as the city's visitors bureau. It owns an office building with a sign in front that advertises its programs, events, and activities. We are advised that the sign also displays "visitors bureau" messages on behalf of the city for roughly six weeks during each year. The chamber leases from the city the land upon which its building and sign are located, which land is adjacent to a city park. Both the contract and the lease are silent with respect to political advertising on the chamber's sign. Under these circumstances, may the city prohibit the chamber from advertising the chamber's support of a ballot measure or a candidate for public office? We conclude that the city may not.
Preliminarily, we note that a city may properly devote public funds to promotional efforts and that, once a city has decided to appropriate and spend money for such a purpose, the task of conducting the city's promotional program may be delegated by contract to a chamber of commerce or other non-governmental agent. (See Gov. Code, § 40100 [legislative body may by ordinance "appropriate a sum for a city publicity or advertising fund"];Sacramento Chamber of Commerce v. Stephens (1931) 212 Cal. 607,610-612; 28 Ops.Cal.Atty.Gen. 326, 333 (1956) [city may apply funds to advertising purposes and allocate them to non-governmental organization to carry out purposes]; see also 86 Ops.Cal.Atty.Gen. 17, 18-21 (2003).)[1] As the Supreme Court observed in Sacramento Chamber of Commerce v. Stephens,supra, 212 Cal. 607:
 ". . . [I]t is now generally held to be well within a public purpose for any given locality to expend public funds, within due limitations, for advertising and otherwise calling attention to its natural advantages, its resources, its enterprises, and its adaptability for industrial sites, with the object of increasing its trade and commerce and of encouraging people to settle in that particular community." (Id. at p. 612.)
On the other hand, a public agency is not authorized to use public funds to campaign for one side or the other in an election contest. (Stanson v. Mott (1976) 17 Cal.3d 206, 216-223;Schroeder v. Irvine City Council (2002) 97 Cal.App.4th 174,185-189; League of Women Voters v. Countywide Crim. JusticeCoordination Com. (1988) 203 Cal.App.3d 529, 541-546 ("Leagueof Women Voters"); Miller v. Miller (1978) 87 Cal.App.3d 762, 7647-73; 88 Ops.Cal.Atty.Gen. 46, 47 (2005); 73 Ops.Cal.Atty.Gen. 255, 258-268 (1990).) Section 54964, subdivision (a), provides:
 "An officer, employee, or consultant of a local agency may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval or rejection of a ballot measure, or the election or defeat of a candidate, by the voters."[2]
The rationale for this prohibition was explained by the Supreme Court in Stanson v. Mott, supra, 17 Cal.3d 206, as follows:
 "Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office [citation]; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (Id. at p. 217.)
The court further observed:
 ". . . The use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave[s] to the `free election' of the people (see Cal. Const., art. II, § 2) does present a serious threat to the integrity of the electoral process." (Id. at p. 218.)
Accordingly, here the city itself may not lawfully use any ofits funds to support or oppose a ballot measure or to endorse or defeat a candidate for public office.[3] Is the chamberof commerce similarly restricted with respect to using chamber
funds and resources, at least in the case of its sign which is located on land leased from the city and is used on occasion not only to advertise the chamber's own programs and activities but also to inform the community of city-sponsored events?
On the one hand, the chamber operates as an independent, nonprofit organization representing local business interests and engaging in activities and pursuits which, in the view of its governing body, promote those interests. On the other hand, it operates under a contract with the city as the city's visitors bureau, receiving public funds to provide information and to promote and stage functions that the city council deems to be in the city's interests.[4]
In 88 Ops.Cal.Atty.Gen. 46, supra, we examined a similar situation that involved the relationship between a community college district and one of its "auxiliary organizations." We were asked whether such an organization could use its funds to advocate the passage of a bond measure placed on the ballot by the community college district, notwithstanding that the district itself could not use its funds for such purpose. (See Ed. Code, §7054.) We concluded that the organization's funds could be so used, observing in part:
 "An `auxiliary organization,' as we use the term here, is one whose goals and purposes support the mission of a community college district or one or more of its colleges. [Citations.] Auxiliary organizations may take a number of forms, including fund-raising nonprofit foundations, student organizations, and entities providing commercial services for the benefit of a district or one of its colleges. [Citations.] Auxiliary organizations may, but need not, be established and operated under the auspices of a community college district board. [Citations.]. . . .
 "California courts have generally recognized auxiliary organizations as private entities rather than as public agencies or as part of the public bodies they seek to aid or assist. [Citations.]. . . . Since an auxiliary organization is not a public entity, its use of its own privately raised funds is not subject to the prohibition against the use of `public funds' for political purposes.
 "We recognize that an auxiliary organization that is officially established under the auspices of a community college district board [citation] may sometimes involve the participation of district officials. [Citation.] Also, auxiliary organizations that are established in this manner are required to act in conformance with the district's regulations, and to submit to district oversight of their financial operations, including an annual audit and report to the district. However, we believe these provisions are insufficient to make an auxiliary organization's funds `public funds' for purposes of [Education Code] section 7054 and the general principles which it embodies. . . .
 "It is to be recognized that auxiliary organizations, particularly those established under the official auspices of a community college district, may enjoy benefits from their association with the district, such as the use of the district's name, reputation, and facilities. . . . [However,] auxiliary organizations, as non-governmental organizations, are entitled to a degree of freedom under the First Amendment to make financial contributions to political causes. [Citations.]. . . ." (Id. at pp. 53-55, fns. omitted.)
In 86 Ops.Cal.Atty.Gen. 17, supra, we again addressed a similar situation, resolving whether a county board of supervisors had validly contracted with a nonprofit corporation to promote tourism and commerce. We first noted that "[a]lthough the corporation engages in other promotional activities for the benefit of its own members, the contract with the county generates most of its income." (Id. at p. 17.) We concluded that the contract was valid even though promoting tourism could not be considered a "function" of the county for purposes of a Penal Code provision dealing with the powers of a county grand jury:
 "Unlike the county board of retirement in [Board of Retirement v. Santa Barbara County Grand Jury (1997) 58 Cal.App.4th 1185], the private corporation here is not performing a `function' of the county when it contracts to provide advertising and promotional services. Advertising is not a government `function' such as operating a pension system for county employees or providing sheriff or fire protection services. The corporation is acting as an independent contractor; its staff is made up of its own private employees, not county employees. Simply put, the corporation cannot be characterized as performing the `functions of the county' for purposes of [Penal Code] section 925." (Id. at p. 22, fn. omitted.)
In the situation presented here, similar to the circumstances examined in our two prior opinions, the chamber of commerce is not a creation of the city and is not governed by the city; it is staffed with its own employees rather than city employees. The chamber's use of its funds and resources to advertise in support of ballot measures or candidates for public office cannot be said to constitute the use of public funds or resources. Under these circumstances, we believe that the city may not prohibit the chamber from posting its messages on its sign under the authority of section 54964, subdivision (a), or any other provision of law.[5]
Here, both the chamber's lease of city land and its contract to provide a visitors bureau for the city are silent with respect to displaying political advertisements on the chamber's sign. If the city determines that a prohibition on the use of the sign for political advertising would be in the city's best interests, so that members of the public would not mistake the chamber's political messages for those of the city's, it may seek to include a contractual term to that effect. (See Hazelwood SchoolDistrict v. Kuhlmeier (1987) 484 U.S. 260 [school district may refuse to sponsor speech that might reasonably be perceived as associating the district with any position other than neutrality on matters of political controversy]; City Council v. TaxpayersFor Vincent (1984) 466 U.S. 789 [city may prohibit posting signs on public property to protect esthetic interests]; Lehman v.City of Shaker Heights (1974) 418 U.S. 298 [city may prohibit political advertisements on city buses]; Planned Parenthood v.Clark County School Dist. (9th Cir. 1991) 941 F.2d 817 [school district may prohibit certain advertisements in athletic event program to avoid "the possible perception of sponsorship and endorsement"]; 77 Ops.Cal.Atty.Gen. 56 (1994) [school district may prohibit teachers from wearing political buttons in classrooms; "the wearing of a political campaign button in such circumstances might reasonably be perceived as bearing the imprimatur of the school district"].) Changing the terms of the lease or contract would, of course, be subject to negotiation between the parties.
Finally, we assume that, in the absence of such a contractual term, the chamber's political advertisements will not be displayed in such a way as to mislead the public, and to thereby improperly influence election outcomes, by giving the impression of governmental funding or endorsement of a message where none exists in fact.
We conclude that a city may not prohibit a chamber of commerce from advertising its support of a ballot measure or a candidate for public office on a sign in front of the chamber's office where the sign is located on land leased from the city and the city contracts with the chamber to act as the city's visitors bureau but the lease and the contract are silent with respect to political advertising on the sign.
[1] All references hereafter to the Government Code are by section number only.
[2] The term "local agency," as used in section 54964, subdivision (a), includes cities. (See §§ 54964, subd. (b)(4); 54951.) We further note that the ban on certain expenditures of public "funds" may be construed to apply not only to an agency's appropriation of money, but also to the agency's application of other public resources or public property to such purposes. (See § 54964, subd. (b)(3) [defining "expenditure"]; Ed. Code, § 7054
[similar restriction on expenditures of school or community college resources, but expressly including "services, supplies, or equipment"]; People v. Battin (1978) 77 Cal.App.3d 635, 650
[use of county staff and services for political campaigning constitutes misappropriation of "public moneys" under former Penal Code section 424]; People v. Sperl (1976)54 Cal.App.3d 640, 661 [use of county car to transport political candidate is misappropriation of public moneys]; see also 58 Ops.Cal.Atty.Gen. 546, 551 (1975) [use of clubhouse or telephone bank to promote or oppose candidate or ballot measure constitutes reportable campaign expenditure under Political Reform Act of 1974].)
[3] This prohibition against using public resources for political campaigns does not prevent a public agency from publicly endorsing or opposing a particular ballot measure in which the agency has an interest or expertise (League of WomenVoters, supra, 203 Cal.App.3d at p. 560 [public agency's "simple decision . . . to go on record with such an endorsement in no event entails an improper expenditure of public funds"]; see alsoChoice-in-Education League v. Los Angeles Unified School Dist.
(1993) 17 Cal.App.4th 415, 430-431), nor does it bar an agency from drafting ballot measures affecting the agency's legitimate interests (League of Women Voters, supra, 203 Cal.App.3d at p. 550; 88 Ops.Cal.Atty.Gen., supra, at pp. 48-50; 73 Ops.Cal.Atty.Gen., supra, at pp. 261-264). Further, the rule expressly does not bar a local agency from providing the public with a fair, accurate, and impartial assessment of a ballot measure's possible effects on that agency. (§ 54964, subd. (c).)
[4] To be sure, the chamber's interests and the city's interests may coincide in a number of areas. However, the chamber's interests are determined by the views of its leadership, and the chamber, as a non-governmental entity, has the ability to engage in activities, such as election campaigning, that are forbidden to the city.
[5] We note that the chamber, in contributing its own funds to a political campaign, may become subject to campaign disclosure rules and obligations under the Political Reform Act of 1974. (See, e.g., §§ 84100-84108 [organization of committees], 84200-84225 [filing of campaign statements], 82013 ["committee" defined], 82015 ["contribution" defined]; see also 88 Ops.Cal.Atty.Gen., supra, at pp. 50, 54.)